FILED

2021 Jan-08  AM 11:24
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **2:19-cr-00461-LSC-JHE-3** |
| | ) | |
| | ) | |
| **ISIAH LUEVONE THOMAS,** | ) | |
| | ) | |
| **Defendant/Movant.** | ) | |

**MEMORANDUM OF OPINION AND ORDER**
**DENYING MOTION FOR NEW TRIAL**

## I.    Introduction

On August 24-26, 2020, defendants Isiah Luevone Thomas ("Thomas") and Tavara Japree Gissendanner ("Gissendanner") were tried and convicted by a jury of conspiracy to possess with the intent to distribute methamphetamine and heroin. Presently before the Court is Thomas's motion for a new trial. (Doc. 162.) For the following reasons, the motion is due to be denied.

## II.    Discussion

Thomas's motion is premised on two grounds. First, he argues that the Government removed five black potential jurors based on their race in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), and that the racial makeup of the jury was

unrepresentative of the racial makeup of his community. Second, he argues that he was denied the right to a fair trial in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), by the Government's withholding of an allegedly exculpatory interview with witness Annethia Anderson until the first morning of trial and later disavowing her trial testimony in its closing argument. Each of Thomas's claims is addressed in turn.

### A.    *Batson* Issues

In *Batson v. Kentucky*, the Supreme Court held that the Equal Protection Clause prohibits prosecutors from striking potential jurors "solely on account of their race." 476 U.S. at 89. To assist district courts in addressing *Batson* challenges, the Supreme Court outlined a three-step inquiry that courts must use in order to determine whether peremptory strikes have been used in a discriminatory manner. First, the party challenging the strike as discriminatory must set forth a prima facie case of discrimination. *Cent. Ala. Fair Hous. Ctr., Inc. v. Lowder Realty Co., Inc.*, 236 F.3d 629, 636 (11th Cir. 2000) (citing *Batson*, 476 U.S. at 96). "'[I]n making out a prima facie case, 'the defendant must point to more than the bare fact of the removal of certain venire persons and the absence of an obvious valid reason for the removal.'" *Id.* at 637 (quoting *United States v. Allison*, 908 F.2d 1531, 1538 (11th Cir. 1990)). Second, if the court agrees that a prima facie case exists, the striking party must articulate a non-discriminatory (i.e., race-neutral) explanation for its strike. *Id.*

at 636. "The reason given need not be a good reason; it can be irrational, silly, implausible, or superstitious, as long as it is facially race-neutral." *United States v. Lovett*, 662 F. App'x 838, 844 (11th Cir. 2016) (citing *United States v. Hill*, 643 F.3d 807, 837 (11th Cir. 2011)). Finally, if the striking party gives a race-neutral rationale, the court must evaluate the persuasiveness of the proffered reason and determine whether the objecting party has carried its burden of proving purposeful discrimination. *See id.* (citing *Hill*, 643 F.3d at 837).

The Court will first discuss the circumstances surrounding the removal of the five potential jurors identified in Thomas's motion. The Court will then turn to Thomas's claim that the racial makeup of his jury violated the principles of *Batson*.

### 1.   Juror F. Jones

Thomas, who is black, argues that the Government removed black potential juror F. Jones on the basis of his race in violation of *Batson*. After the jury was struck, Thomas's defense counsel raised a *Batson* challenge regarding the Government's preemptory striking of F. Jones. (Doc. 159 at 102.) In support of his *Batson* challenge, Thomas's counsel argued that there was a disparity between the percentage of black potential jurors on the jury venire and the number of black jurors actually remaining on the jury panel, after the peremptory strikes had been exercised. (*Id.*) Thomas's counsel stated that there was only one black juror left on the jury, but he was

mistaken. (*Id*. at 102.) In fact, two black jurors served on the 12-person jury, and one of the two alternate jurors was black. In any event, this Court responded to Thomas's counsel's *Batson* challenge as follows:

> I mean, numbers themselves don't make out a prima facie case. Demonstration that someone is struck for—that didn't give any reason to strike them would be the kind of information that I would need, particularly if you can compare that to white jurors that were not struck saying the same thing.
>
> It's obvious to me, unless you demonstrate a prima facie case of *Batson*, for me to even ask the Government to delineate the reasons and you haven't done that.

(*Id*. at 103-04.) The Government, without prompting by this Court, offered that Jones had raised his hand during voir dire indicating that he favored the legalization of marijuana. (*Id*.) Thomas's counsel then replied that two white jurors who were not struck by the Government also favored legalizing marijuana (*id*. at 104), but the Government then offered that Jones was sleeping during voir dire and had also raised his hand indicating that he had a negative view of law enforcement (*id*. at 106). This Court rejected Thomas's *Batson* challenge as to Jones. (*Id*. at 107.)

Assuming for argument's sake that Thomas had established a prima facie case of discrimination under *Batson* by pointing out that Jones was struck by the Government because he favored legalizing marijuana while two white potential jurors were not struck who expressed the same views, the Government met its

burden of showing that it struck Jones for several race-neutral reasons—Jones indicated that he had a negative view of law enforcement, and he was sleeping during voir dire. Thomas has done nothing to demonstrate that these reasons were a pretext for purposeful discrimination on the part of the Government. A new trial is not warranted on this ground.

### 2.    Jurors K. Wallace, E. Plain, V. Johnson, and K. Bell

Thomas also asserts that "the process that led to the preemptory strikes of [potential] Juror[s] Wallace, Plain, Bell, and Johnson" violated *Batson*. (Doc. 162 at 2.) Thomas contends generally that because the Government asked questions of the jury venire regarding their attitudes towards law enforcement based upon recent events involving law enforcement that were highly televised and publicized in the national media, and two potential jurors—K. Wallace and E. Plain—verbalized negative views of law enforcement, that other members of the venire were "poison[ed]" by their responses, which allowed the Government to strike other members of the jury venire who "they believed, though not in the record, expressed sympathies with the views of Wallace and Plain." (*Id.* at 2-3.) Thomas further asserts, "With the benefit of hindsight, questions of this type requiring verbal responses would have been better suited for individual voir dire . . . ." (*Id.* at 3.) Despite Thomas's failure in his motion to provide any specifics surrounding the

removal of these four individuals, the Court will do so before addressing Thomas's overall argument that the group questioning somehow violated *Batson*.

### i.    Juror K. Wallace

During group voir dire, the Court asked the jury venire whether anyone would automatically disbelieve or believe a law enforcement officer who was testifying without applying the same credibility standards that should be applied to any other witness. (Doc. 159 at 57.) K. Wallace raised his hand and stated: "As a black man living in the United States at this time, I don't know if I can give . . . the benefit of the doubt." (*Id.* at 58.) When the Government later asked the jury venire if anyone's opinions about law enforcement had changed over the past year due to recent televised events, Wallace stated: "My opinion was bad and it just got worser [sic]." (*Id.* at 62.)

At the defense's request, this Court later called Wallace in for individual voir dire, during which time he stated that he would not believe a law enforcement officer on "word alone" but would have to "have body cam or something more than just word alone." (*Id.* at 87.) He also expressed that he was "not inclined to" believe law enforcement without photographs or some other type of documentation. (*Id.*) When asked whether he could apply the same credibility standard to a law enforcement officer that he would apply to any witness, he repeatedly stated that he did not know

if he could. (*Id.* at 88.) When asked by Gissendanner's defense counsel whether he would give an officer the same credit as any other witness, Wallace first responded that he "can't give them the benefit of the doubt just because they wear the uniform." (*Id.* at 89.) When pressed, Wallace expressed that he would not give law enforcement "extra credit" but that he would "do [his] best" to give them the same credit. (*Id.*) This Court then stated, "I have to have it clearer than that" and asked Wallace again whether he would apply the same standard of credibility to an officer as any other witness, and at that point Wallace replied that he would. (*Id.* at 90.)

After the conclusion of voir dire, the Government moved to strike Wallace for cause (*id.* at 95), but this Court denied that motion, explaining that although it was a close call, Wallace appeared to, at the end of his individual voir dire session, have expressed that he could remain fair and neutral. (*Id.* at 96.)

After the jury was struck, Gissendanner's defense counsel raised a *Batson* challenge regarding Wallace. (*Id.* at 99.) The following exchange occurred:

> The Court:  That will be denied. I obviously know of a race neutral reason to strike him, so I don't need to ask the Government to tell me what it is.
>
> Counsel:  I understand, your honor. For purposes of the record, may I request that we put that on the record?
>
> The Court:  No. You have not made a prima facie showing of *Batson* because, obviously, he said that he dislikes police, that he doesn't give them the benefit of the doubt. At first he said

I wouldn't believe them because they were law enforcement, and then he changed. And I basically allowed him to stay. But then I knew the Government would strike him. I didn't give them a challenge for cause. I almost did.

Counsel:      Understood, your honor. And the prima facie case I would make is that what the Court referenced at the end, his ending statements, as we discussed earlier. But I understand the Court's ruling.

The Court:    Even his ending statements, Jamie, were not sufficient. Because his ending statements, what he said at the end was derogatory toward law enforcement. He said, I haven't changed my opinion in the last, however many months, six months or whatever one of ya'll asked about. And, I mean, it was like pulling  teeth for ya'll to rehabilitate him. I think Derek was able to finally rehabilitate him sufficiently to keep him from being struck for cause. But he absolutely, there was race neutral reasons, several of them to strike him.

Counsel:      Understood, your Honor. Thank you.

(*Id.* at 100.)

This Court continues to reject any *Batson* challenge regarding Wallace.

Thomas has not made out a prima facie case of discrimination. *See Cent. Ala. Fair*

*Hous. Ctr., Inc.*, 236 F.3d at 636 ("[T]he establishment of a prima facie case is an

absolute precondition to further inquiry into the motivation behind the challenged

strike."). Even if he had, the Government offered a race-neutral reason for striking

Wallace—his clearly-expressed distrust of law enforcement. A new trial is not warranted on this ground.

### ii.    *Juror E. Plain*

E. Plain also raised her hand during group voir dire in response to the Government's question whether anyone's views of law enforcement had changed recently due to televised events. (Doc. 159 at 62.) Plain said: "Yes. I agree, I think, as a mother of a black son, but [sic] my opinion has become worse of law enforcement." (*Id.*) Plain was later called in for individual voir dire, at which point she stated that she could "absolutely" be fair in applying the same credibility standard to a law enforcement officer's testimony as any other witness's testimony. (*Id.* at 91.)

Contrary to Thomas's assertion, the Government did not peremptorily strike Plain, and she in fact served on the jury. A new trial is not warranted for any reason having to do with Plain.

### iii.    *Juror V. Johnson*

During group voir dire, V. Johnson stated that she has a law degree, works as a probation officer, and volunteers for the Alabama Justice Initiative, which is an organization that supports prison reform. (*Id.* at 37-38.) She also indicated that she was familiar with, through her volunteer work with the Alabama Justice Initiative,

not only Bullock Correctional Facility, where one of the defendants in this case was housed during the commission of the crimes charged (*id.* at 70), but that she was also familiar with several of the federal public defenders representing the defendants in this case (*id.* at 44). This Court called her in for individual voir dire, at which point she stated that at Bullock Correctional Facility, there existed inmate-on-inmate violence, officer-on-inmate violence, and inadequate facilities, and she also stated that she believed that an inmate was killed there a few days prior to the start of trial. (*Id.* at 94.) Johnson then stated, however, that she could be fair and neutral to all parties in this case, because "My full time job is a probation officer, so I am used to being neutral and unattached to parties. That's what I do for a living." (*Id.* at 95.)

After the jury was struck, Thomas's defense counsel raised a *Batson* challenge regarding Johnson. (*Id.* at 103.) This Court rejected the challenge, implying that the race-neutral reasons the Government had for striking Johnson were that she volunteered for prison reform and had made various statements about negative aspects of Bullock Correctional Facility. (*Id.*)

The Court continues to reject Thomas's *Batson* challenge with regard to Johnson. Thomas did not and still has not made out a prima facie case of discrimination. *See Cent. Ala. Fair Hous. Ctr., Inc.*, 236 F.3d at 636 ("Indeed, we have stressed that "[n]o party challenging the opposing party's use of a peremptory

strike . . . is entitled to an explanation for that strike, much less to have it disallowed, unless and until a prima facie showing of racial discrimination is made.") (quoting *United States v. Stewart*, 65 F.3d 918, 925 (11th Cir. 1995)). A new trial is not warranted on this ground.

### iv.    *Juror K. Bell*

During group voir dire, K. Bell responded to a question by the Court regarding whether anyone had had a particularly positive or negative experience with law enforcement that might affect them. (Doc. 159 at 49.) Bell described an incident where her son was questioned by law enforcement, forcefully removed from his vehicle, and ultimately arrested, while a white man who was with him was not questioned. (*Id.* at 50.) She further stated that her son was innocent. (*Id.* at 51.) She then stated, however, that she could set that incident aside in deciding this case. (*Id.*)

Although the Government struck Bell, neither Thomas nor Gissendanner's defense counsel raised a *Batson* challenge regarding Bell at trial. Thus, the Court can only assume that Thomas is now arguing that the Government struck Bell because the Government perceived that she had the same negative views of law enforcement as those expressed by potential jurors K. Wallace and E. Plain. Even if the Government did strike Bell because she maintained negative views of law enforcement officers, such is a facially race-neutral reason for using a peremptory

strike. This is because distrust of the police or concerns considering the fairness of the criminal justice system are viewpoints that may be shared by black and white individuals alike.

It appears that Thomas does not agree, as he states in his motion:

In the greater societal context, should the result in this matter be permitted to stand, and should similar procedures occur in other trials, a terrible irony results: the more harsh, dishonest and/or violent law enforcement are perceived to be by the African-American community, whether valid or not, the lower the chances are that African American jurors will have the opportunity to serve on juries. Likewise, the larger societal dynamics resulting from the George Floyd incident, and others, will lower, or eliminate entirely, the chances of having a representative jury for African American defendants being tried in this district should similar processes be replicated in other cases.

(Doc. 162 at 3.)

To the extent that Thomas implies that fear or distrust of law enforcement is not a race-neutral reason for the use of a peremptory challenge because minority races more commonly possess such fears, his claim is foreclosed by existing federal constitutional law.

First, in 1991 in *Hernandez v. New York*, the United States Supreme Court concluded that a prosecutor had not violated *Batson* by using peremptory challenges to exclude Latinx jurors by reason of their ethnicity when he offered as a race-neutral explanation his concern that bilingual jurors might have difficulty accepting the court

interpreter's official translation of multiple witnesses' testimony given in Spanish. 500 U.S. 352, 357-58 (1991) (plurality opinion). In so concluding, the Supreme Court rejected the argument that the prosecutor's reasons were not race-neutral and thus violated the Equal Protection Clause as a matter of law because of their disproportionate impact on Latinx jurors. *See id.* at 362–63. The Court relied on "the fundamental principle that official action will not be held unconstitutional solely because it results in a racially disproportionate impact." *Id.* at 359-60 (quoting *Arlington Heights v. Metropolitan Housing Development Corp.* 429 U.S. 252, 264-65 (1977)). Rather, as the Court explained, "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. Discriminatory purpose implies more than . . . intent as awareness of consequences. It implies that the decision maker . . . selected . . . a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Id.* at 360 (quoting *Arlington Heights*, 429 U.S. at 264-65; *Personnel Administrator v. Feeney*, 442 U.S. 256, 279 (1979)). The Court continued, stating:

> A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.

*Id.* The Court did, however, hold that a stated reason's disparate impact on a particular race may be considered as relevant evidence of purposeful discrimination at *Batson*'s third step, where the trial court may consider the totality of the circumstances in deciding whether it believes the prosecutor's stated reason for the strike or whether it believes that the stated reason is actually a pretext for racial discrimination. *Id.* at 363.

Thus, a disparate impact theory cannot be used, by itself, to invalidate the Government's stated reasons for removal of a juror at step two of the *Batson* inquiry. In *United States v. Houston*, 456 F.3d 1328 (11th Cir. 2006), the Eleventh Circuit applied this principal to reject a similar argument to the one that Thomas appears to be making here. In that case, the defendant argued that the prosecutor's stated reasons for dismissing four black venire members—that they each stated that they had family members with criminal histories—was not race-neutral because statistics show that significantly more blacks than whites are convicted of crimes in the United States. *Id.* at 1336. The defendant argued that "requiring the venire members to indicate whether they have had any family members convicted of crimes, and then using their positive responses as the sole justification for disqualifying them, is a strategy that impacts blacks more heavily than whites." *Id.* In rejecting the argument, the Eleventh Circuit noted that because claims of disparate impact are not cognizable

under the Equal Protection Clause of the Fourteenth Amendment or the Due Process Clause of the Fifth Amendment, a disparate impact theory cannot be used by itself to invalidate the Government's stated reasons at step two of the *Batson* inquiry. *Id.* (citing *Washington v. Davis*, 426 U.S. 229, 239 (1976)). Rather, it noted that *Batson* requires a purposeful intent to discriminate. *Id.* The court then took note of its prior cases holding that a potential juror's prior family involvement with drug charges is a "reasonably specific" and "neutral" explanation for a prosecutor's exercise of a peremptory strike against that juror. *Id.* at 1337 (citing *United States v. Alston*, 895 F.2d 1362, 1367 (11th Cir. 1990)).

Additionally, post-*Hernandez* cases from other circuits have rejected the exact disparate impact theory that Thomas raises here. The Seventh Circuit rejected the argument that "the government's proffered justification for the strike—bias against law enforcement—is not race neutral because African-Americans are disproportionately affected by negative interactions with law enforcement," holding, "Even accepting the premise of this argument, it does not support a finding of pretext. *Batson* protects against intentional discrimination, not disparate impact." *United States v. Brown*, 809 F.3d 371, 375–76 (7th Cir. 2016), cert. denied, 136 S. Ct. 2034 (2016). The Eighth Circuit rejected the argument that "the real reason for moving to strike [two black jurors] was that they exhibited strong agreement with the

suggestion that police could be wrong [and] this explanation is illegitimate and discriminatory because distrust of police officers is prevalent among African Americans." *United States v. Arnold*, 835 F.3d 833, 842 (8th Cir. 2016).

Further, the Eleventh Circuit and other courts have accepted distrust of the criminal justice system or law enforcement officers as a race-neutral explanation for peremptorily challenging a juror. *See United States v. Gamory*, 635 F.3d 480, 496 (11th Cir. 2011) ("Juror 13 harbored doubts about her ability to be impartial based upon her belief that her brother had been the victim of police brutality. . . . [This] characteristic is [not] peculiar to any race."); *Brown*, 809 F.3d at 376 ("[W]e have acknowledged that bias against law enforcement is a legitimate race-neutral justification."); *United States v. Alvarez-Ulloa*, 784 F.3d 558, 567 (9th Cir. 2015) (potential distrust of law enforcement may ground a peremptory strike); *United States v. Moore*, 651 F.3d 30, 43 (D.C. Cir. 2011) (same), aff'd sub nom. *Smith v. United States*, 568 U.S. 106 (2013).

All of this is to say that, if Thomas is asserting that it was racially discriminatory for the Government to have struck K. Bell—or any of the other individuals named in the motion—on the ground that she harbored negative views of law enforcement, that claim fails.

Finally, although Thomas argues that the Court should have conducted individual voir dire regarding each juror's opinions on law enforcement, he cites to no authority for such a proposition. Trial courts have broad discretion in deciding the method of jury voir dire. *Cummings v. Dugger*, 862 F.2d 1504, 1507 (11th Cir. 1989). "The standard for evaluating the district court's exercise of its discretion is whether the procedure used for testing juror impartiality created 'a reasonable assurance that prejudice of the jurors would be discovered if present.'" *Id.* (quoting *United States v. Tegzes*, 715 F.2d 505, 507 (11th Cir. 1983)). In some types of cases, such as those where the defendants have been the subject of extensive pretrial publicity, courts have ruled that the preferred approach is to conduct individual examinations of the jurors. *See, e.g., United States v. Davis*, 583 F.2d 190, 196 (5th Cir. 1978). This is not such a case, and Thomas has not demonstrated that individual questioning was required for any reason.

### 3.    Unrepresentative Jury

In addition to naming five individuals whom he says were illegally struck on account of their race, Thomas also argues that the racial makeup of his jury violated the principles of *Batson*. He cites U.S. Census data showing that the division from which the jurors were drawn—Jefferson, Blount, and Shelby Counties—is roughly 1/3 black. He then asserts: "The jury that reached a verdict in this case (2 African-

Americans out of 12 or 16.7%; two additional African-Americans served as alternates)[1] was less than one-half as representative of the community of which Mr. Thomas belongs." (Doc. 162 at 2 n.1).

Thomas's counsel made a similar argument on the first day of trial. After the jury was struck, Thomas's counsel noted that there was a "disparity" between the "pretty substantial representation in the courtroom" of black individuals on the venire and the black individuals remaining on the panel. (Doc. 159 at 102.) Thomas's counsel asked the Court to "toss" the "venire and the remaining panel" and "start over so we can get a jury that is more representative of the community and would be a juror [sic] of the peers of Mr. Thomas." (*Id.* at 103.) As noted previously, this Court responded, "Numbers themselves don't make out a *Batson* prima facie case. Demonstration that someone is struck for—that didn't give any reason to strike them would be the kind of information that I would need, particularly if you can compare that to white jurors that were not struck saying the same thing." (*Id.* at 104.)

As an initial matter, the Court does not read Thomas's "unrepresentative jury" claim as asserting that the Northern District of Alabama's jury selection procedures disproportionately exclude black individuals from jury service. Those types of challenges are generally raised pursuant to one of the following: (1) the Sixth

---

[1]      Again, Thomas is incorrect. One of the two alternate jurors was black.

Amendment right to a jury pool that is composed of a fair cross-section of the community, *see Duren v. Missouri*, 439 U.S. 357 (1979); (2) the Fifth Amendment rights of jurors to equal protection under the law, *see Cunningham v. Zant*, 928 F.2d 1006 (11th Cir. 1991); or (3) a violation of the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861, *et seq.*, which provides that "all litigants shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes," *see United States v. Maskeny*, 609 F.2d 183, 191 (5th Cir. 1980). *See United States v. Grisham*, 63 F.3d 1074, 1077 (11th Cir. 1995). The challenger must usually show "(1) that the group alleged to be excluded is a distinctive group in the community, (2) that representation of the group in venires is not fair and reasonable in relation to the number of persons in the community, and (3) that the underrepresentation is due to a systematic exclusion of the group in the jury-selection process." *Id.* at 1078 (citing *Duren*, 439 U.S. at 364). However, so long as there is no allegation of racial gerrymandering, "selecting juries at random from a predetermined geographical area provides a sufficiently diverse jury pool to ensure impartiality." *Id.* at 1080.

Although at trial, Thomas's counsel urged the Court to "toss" the entire "venire," Thomas does not now avail himself of any of these methods of establishing that his venire, or his panel, was racially disproportionate to his community.

Moreover, Thomas has certainly made no indication that there exists any kind of systemic exclusion of black individuals as jurors in the Northern District of Alabama.

In any event, the Court's records show that the racial makeup of the jury venire in this case was indeed proportionate to the racial makeup of Thomas's community. The undersigned directed the Clerk of Court to keep all records pertaining to the individuals summoned to appear for the jury venire in this case. (*See* doc. 159 at 6.)  Those records establish that 200 individuals were summoned for the pool of jurors. Of those 200, 47 (23.50%) were black.[2] The Court's computer system randomly selected 61 of those 200 individuals to form a jury venire. Fifty-two of those 61 actually reported for jury duty on the first day of trial. Out of those 52, 15 (28.85%) were black.[3] From this 52-person venire that included 15 black individuals, 35 were randomly selected by the computer system to go into the courtroom for voir dire. The remaining members of the panel stayed in the jury assembly room in case they were needed, but they were not. Out of this 35, eight (22.86%) were black.[4] Thus, the percentage of black individuals versus individuals of other races that were

---

[2]     146 were white, three were Asian, one identified as "Other," and three identified as "Unknown."

[3]     34 were white, two were Asian, and one identified as "Unknown."

[4]     26 were white, and one was Asian.

summoned for this case was certainly not drastically disproportionate to the number of black individuals that Thomas claims reside in his community.

In an abundance of caution, the Court will address the possibility that Thomas's "unrepresentative jury" claim is a *Batson* challenge premised on the fact that the Government used four out of its six peremptory challenges to remove black individuals. However, as the Eleventh Circuit explained in *Central Alabama Fair Housing Center, Inc.*, Thomas must show more than "numbers alone" to be successful on a *Batson* claim:

> To begin with, the mere fact of striking a juror or a set of jurors of a particular race does not necessarily create an inference of racial discrimination. The number of persons of a particular race struck takes on meaning only when coupled with other information such as the racial composition of the venire, the race of others struck, or the voir dire answers of those who were struck compared to the answers of those who were not struck. This Court has held that "[i]n making out a prima facie case, 'the defendant must point to more than the bare fact of the removal of certain venire persons and the absence of an obvious valid reason for the removal'." *United States v. Allison*, 908 F.2d 1531, 1538 (11th Cir. 1990). A party advancing a *Batson* argument ordinarily should "come forward with facts, not just numbers alone." *United States v. Bergodere*, 40 F.3d 512, 516 (1st Cir. 1994). Consequently, a showing that a party used its authorized peremptory strikes against jurors of one race does not, standing alone, establish a prima facie case of discrimination.
>
> That said, an inference of discrimination based on the number of jurors of a particular race may arise where there is a substantial disparity between the percentage of jurors of one race struck and the percentage of their representation on the jury. *See, e.g., United States v. Alvarado*, 923 F.2d 253, 255 (2d Cir. 1991) ("Only a rate of minority challenges

significantly higher than the minority percentage of the venire would support a statistical inference of discrimination."); *United States v. David*, 662 F. Supp. 244, 246 (N.D. Ga. 1987) (finding that "[a]though the percentage of black jurors struck from a jury panel might establish a prima facie case in some instances, here it does not because . . . the number of black persons on the regular panel was small."). Thus, the number of jurors of one race struck by the challenged party may be sufficient by itself to establish a prima facie case where a party strikes all or nearly all of the members of one race on a venire. *See United States v. Williams*, 936 F.2d 1243, 1246 (11th Cir. 1991) (finding a prima facie case where prosecutor struck all of the African–American members of the venire).

236 F.3d at 636-37.

As noted previously, eight of the 35 members of the jury venire were black. Gissendanner and Thomas were allotted a combined ten peremptory juror strikes and one peremptory alternate strike, and the Government was allotted six peremptory juror strikes and one peremptory alternate strike. Gissendanner and Thomas used two of their ten peremptory strikes to remove black jurors, and the Government used four of its six peremptory strikes to remove black jurors. Two black individuals ultimately served on the twelve-person jury, and one black individual served as an alternate juror.

Thus, the Government did not strike all, nearly all, or even most black individuals from the venire. The Eleventh Circuit has held that the unchallenged presence of jurors of a particular race on a jury substantially weakens the basis for a prima facie case of discrimination in the peremptory striking of jurors of that race.

*See, e.g., United States v. Puentes*, 50 F.3d 1567, 1578 (11th Cir. 1995) ("Although the presence of African–American jurors does not dispose of an allegation of race-based peremptory challenges, it is a significant factor tending to prove the paucity of the claim."); *United States v. Allison*, 908 F.2d 1531, 1537 (11th Cir. 1990) (finding that the unchallenged presence of black individuals on a jury undercuts the inference of impermissible discrimination that might arise solely from striking other black prospective jurors); *United States v. Dennis*, 804 F.2d 1208, 1211 (11th Cir. 1986) ("[T]he unchallenged presence of two blacks on the jury undercuts any inference of impermissible discrimination that might be argued to arise from the fact that the prosecutor used three of the four peremptory challenges he exercised to strike blacks from the panel of potential jurors and alternates.").

Thus, viewed in context, the fact that the Government used four of its six peremptory strikes to remove black jurors does not establish a prima facie case of discrimination under *Batson*. Two black individuals (including Juror E. Plain, who had also expressed some distrust of law enforcement) ultimately served on the twelve-person jury, and one black juror served as an alternate. Any claim premised on the number of black individuals struck by the Government fails.

**B.    *Brady* Issues and Witness Annethia Anderson**

Thomas also argues that the Government violated his right to a fair trial by withholding an allegedly exculpatory interview with Government witness Annethia Anderson ("Anderson") until the first day of trial and later disavowing her trial testimony during its closing argument.

### 1. Background

The evidence showed that Thomas participated in a conspiracy with Gissendanner and others to distribute drugs. Gissendanner orchestrated the delivery of a package containing heroin and a drug press to Thomas on April 10, 2019. Law enforcement intercepted the package earlier that day after Anderson had delivered it to Darrell Haynes ("Haynes"), a confidential informant. Law enforcement replaced the heroin with "sham" heroin. After Thomas accepted the package, Thomas was arrested and his phone was seized.

Anderson was indicted in this case as a co-conspirator but was allowed to enter into a pretrial diversion agreement with the Government in exchange for her testimony at trial. At trial, Anderson discussed the April 10th package and several others she handled at the request of Gissendanner. Anderson testified that she did not know the precise contents of the packages but came to be suspicious of them after a comment made to her by Haynes on April 10th.

On June 9, 2020, Anderson gave an interview to law enforcement. The Government provided a recorded copy of the interview to Gissendanner and Thomas's counsel on the first morning of trial. Anderson's interview was largely consistent with her trial testimony in that she stated that she did not know what was in the packages that she handled for Gissendanner. Trial began on August 24 and concluded on August 26, 2020. Thomas's counsel made no motion to continue or delay the proceedings during trial on account of Anderson's interview.

### 2.    Anderson's Interview

The first part of Thomas's *Brady* claim is that the Government delayed in providing him with the recorded interview of Anderson's statement to law enforcement until the first day of trial.

*Brady* obligates the government to disclose only favorable evidence that is "material." The "touchstone of materiality is a 'reasonable probability' of a different result." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). Accordingly, under *Brady*, the government need only disclose during pretrial discovery (or later, at the trial) evidence which, in the eyes of a neutral and objective observer, could alter the outcome of the proceedings. *United States v. Jordan*, 316 F.3d 1215, 1252 (11th Cir. 2003). A *Brady* violation can occur if the prosecution delays in transmitting evidence during a trial, but only if the defendant can show prejudice, e.g., the material came

so late that it could not be effectively used. *United States v. Beale*, 921 F.2d 1412, 1426 (11th Cir. 1991).

Thomas' claim of a *Brady* violation fails for several reasons. First, Anderson's interview does not contain information favorable to Thomas. There was no evidence introduced at trial to suggest that Anderson knew or ever communicated with Thomas. Indeed, the package she handled that was intercepted by law enforcement on April 10th was ultimately delivered to Thomas by another witness. Accordingly, Anderson's knowledge as to the April 10th package's contents had no direct bearing on Thomas's knowledge of them or his guilt of the conspiracy with which he was charged. Put another way, Anderson's knowledge of the contents of the April 10th package does nothing to exculpate Thomas as to his conspiracy with Gissendanner and others.

Second, Anderson's interview was not "material" in the *Brady* analysis, given the context of the other evidence presented at trial. For example, evidence was presented that: Thomas and Gissendanner communicated by phone the day before the April 10th heroin delivery; Thomas's phone contained images of kilogram-sized quantities of suspected drugs; Thomas's phone contained an image of a heroin field-test kit and its results; Thomas's phone provided evidence of other, apparently drug-related conversations with unidentified conspirators; and surveillance video from

the barber shop where Thomas accepted the April 10th package shows Thomas looking into the package (containing a drug press and sham heroin) after he received it. In view of these and other items of evidence presented at trial, Anderson's interview to law enforcement, if it had been provided to Thomas's counsel earlier, would not have altered the outcome of the trial.

Indeed, while Thomas claims that this pre-trial disclosure was not early enough, he did not seek any continuance at trial, and he fails now to provide the Court with any example of how he was unable to effectively use Anderson's interview as part of his defense. Thomas claims that his defense theory was that he, like Anderson, was not aware of the contents of the April 10th package that was in his possession for a very short period before he was arrested. Thomas was provided ample opportunity to explore this defense and present evidence of it at trial. However, whether Thomas knew what was in the package or not is irrelevant because specific knowledge of the contents of the April 10th package was not an element of the charge against which Thomas had to defend. Rather, Thomas stood accused of willfully joining a conspiracy that lasted several weeks, and the evidence at trial showed communications with co-conspirators regarding drug trafficking on dates other than April 10th.

### 2.    The Government's Closing Argument

The second part of Thomas's *Brady* claim is that the Government knowingly presented false testimony by Anderson and then "disavowed" it in its closing argument. The portion of the Government's closing argument about which Thomas complains is as follows:

> LIKEWISE, WITH MS. ANDERSON, WHO TESTIFIED EARLIER TODAY, SHE WAS GIVEN A PRETRIAL DIVERSION AGREEMENT. AND SHE KNEW THAT SHE HAD TO COME IN AND TESTIFY TO HER ROLE IN THIS. AGAIN, KNOWS T.J., KNOWS MR. GISSENDANNER THROUGH HER WORK IN THE DEPARTMENT OF CORRECTIONS, NO QUESTION THAT SHE WAS TALKING TO HIM WHEN HE ASKED HER TO DO HIM A FAVOR, AND THEN DO HER A FAVOR. EVEN MS. ANDERSON, WHO TESTIFIED SHE HAS NO CONVICTIONS, SHE HOPES NOT TO HAVE A CONVICTION COMING OUT OF THIS PROCEEDING, THAT SHE NEVER LOOKED IN A BOX, EVEN SHE KNEW THAT SOMETHING WASN'T RIGHT ABOUT THIS. EVEN SHE COULD SUSPECT –

(Doc. 161 at 152.)

Thomas's claim fails. The Government merely highlighted in closing the fact that Anderson admitted that she came to be suspicious of the nature of the packages she delivered for Gissendanner after Haynes made a comment to her on April 10th. Thomas's claim that the Government knowingly presented perjured testimony is baseless.

## IV.   Conclusion

For the aforementioned reasons, Thomas's motion for new trial (doc. 162) is hereby **DENIED**.

**DONE** and **ORDERED** on January 8, 2021.

_____
L. Scott Coogler
United States District Judge

160704